John Heenan
Joseph F. Cook
**HEENAN & COOK, PLLC**
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
Email: john@lawmontana.com
Email: joe@lawmontana.com

Steve W. Berman*
Jacob P. Berman*
Meredith S. Simons*
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Email: steve@hbsslaw.com
Email: jakeb@hbsslaw.com
Email: merediths@hbsslaw.com

*Pro hac vice application to be filed

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | | |
|---|---|---|
| WENDY WIDHALM-SCHLOSSER, individually and as Administrator for the Estate of Dennis Schlosser, | ) ) ) ) | Case No. <u>CV-25-120-BU-JTJ</u> |
| Plaintiff, | ) ) | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | ) ) | |
| FORD MOTOR COMPANY, | ) ) | |
| Defendant. | ) ) | |

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION .........................................................................................1

II.    PARTIES ....................................................................................................4

       A.    Plaintiff .........................................................................................4

       B.    Defendant ......................................................................................5

III.   JURISDICTION AND VENUE ...................................................................5

IV.    STATEMENT OF FACTS ..........................................................................6

       A.    Ford Super Duty Trucks, Including the F-250, Are
             Immensely Profitable ...................................................................6

       B.    Ford Marketed the Super Duty Trucks, Including the F-
             250, As Safe and Reliable ...........................................................7

       C.    Weak Roofs Are an Extraordinary Safety Hazard, but
             Ford Lobbied Against Robust Federal Regulation of Roof
             Strength .........................................................................................9

       D.    Ford Knew Super Duty Roofs Were Dangerously Weak,
             but Sold Them Anyway...............................................................14

       E.    Ford Could Have Designed Super Duty Trucks with
             Stronger, Safer Roofs .................................................................24

       F.    Super Duty Roofs Were Routinely Crushed in Rollovers,
             but Ford Chose Not to Warn Consumers ...................................27

       G.    The Schlossers' Super Duty Rolled Over and Killed Mr.
             Schlosser......................................................................................29

V.     CAUSES OF ACTION...............................................................................31

COUNT I STRICT PRODUCT LIABILITY  (DEFECTIVE DESIGN
       & FAILURE TO WARN) .............................................................31

COUNT II NEGLIGENCE.................................................................................33

COUNT III LOSS OF CONSORTIUM ................................................................34

COUNT IV PUNITIVE DAMAGES ........................................................................35

PRAYER FOR RELIEF ............................................................................................35

JURY DEMAND ..........................................................................................................36

Plaintiff Wendy Widhalm-Schlosser ("Mrs. Schlosser"), individually and as the Administrator for the Estate of Dennis Schlosser ("Mr. Schlosser"), by and through her attorneys, based on her individual experience, the investigation of counsel, and information and belief, brings this Complaint against Ford Motor Company ("Ford" or "Defendant"), and alleges as follows:

## I.    INTRODUCTION

1.    Ford Motor Company designed, manufactured, and continues to sell 2003 Ford Super Duty F-250 trucks equipped with a defective roof structure that catastrophically collapses during rollover accidents ("Roof-Crush Defect").

2.    Decedent Dennis Schlosser purchased a 2003 Ford F-250 Super Duty (the "Schlossers' Super Duty").

3.    When the Schlosser's bought their truck, Ford knew that Super Duty roofs were collapsing in rollover accidents, intruding into passenger compartments, and killing drivers and passengers. Ford knew, and it had been hiding the Roof-Crush Defect from consumers for years.

4.    As a result of the Roof-Crush Defect and Ford's subsequent refusal to warn consumers, Mr. Schlosser is dead. In July 2025, the Schlossers' Super Duty and the trailer it was pulling were hit by a gust of wind on a rural Nevada highway, causing an accident.

5.     In a properly designed truck, this would have been frightening, but not deadly as it was here, where the driver's-side roof of the Schlossers' Super Duty collapsed during the rollover, crushing Mr. Schlosser and causing injuries that eventually killed him.

6.     Mr. Schlosser is dead because Ford wanted to save a few dollars per truck on the manufacture of the Super Duty model. Ford designed the model years 1999–2016 Super Duty trucks with a roof that is crushed in the event of a rollover, resulting in the grave injury, paralysis, or death of vehicle occupants.

7.     Mr. Schlosser's fatal injuries are the direct result of a roof design that Ford knew was extraordinarily weak. Below is a photo of the Schlossers' Super Duty taken after the rollover. The crushed roof on the driver's side is clearly visible:



8.     Documentation of Ford's internal testing and safety evaluations show that prior to the development of the 1999–2016 Super Duty trucks, Ford knew that rollovers were far more dangerous to vehicle occupants than other types of crashes. These documents also show that Ford knew strong vehicle roofs were fundamental to minimizing serious injury in a rollover.

9.     Despite this knowledge, Ford weakened the roof structure on Super Duty trucks to save money on labor and tooling costs. In the years of development leading to the release of the Super Duty trucks, Ford weakened almost every component of the roof structure to save money. It never performed *any* physical testing of Super Duty roof strength, and it conveniently lost records of the computerized testing it claims it did perform.

10.    Ford knew Super Duty roofs were weak before the first truck rolled off the assembly line, but it did not refrain from selling its dangerously defective vehicles. Nor did Ford warn Super Duty owners and potential buyers about the risk of roof crush when it began receiving reports of drivers being paralyzed or killed in rollovers. Instead, it continued selling the Super Duty trucks using the same defective design until 2016. And when confronted with cases claiming a defect existed, Ford asserted the false claim that roof strength does not prevent injuries in rollover crashes. Often, when a case alleged injury or wrongful death, Ford entered

into secret settlements with victims and their families to hide the deadly nature of its roof design.

11.     Ford still hasn't taken any steps to warn the public about the risks posed by the Roof-Crush Defect in the 1999–2016 Super Duty trucks. These trucks are still on the road in Montana, their drivers completely unaware that they face a heightened risk of permanent disability or death every time they get in their vehicles.

12.     A vehicle that introduces an unreasonable risk of grave injury, including paralysis, in a common type of accident is not fit for its ordinary purpose and is not properly designed. When a vehicle manufacturer can eliminate a grave safety defect on a vehicle model line but instead chooses to save manufacturing costs and sell trucks that are prone to roof collapse to uninformed consumers, the manufacturer evinces a reckless disregard for public safety.

13.     Plaintiff brings this case for strict product liability, negligence, loss of consortium, and punitive damages, and seeks all available compensatory damages, including for survivorship and wrongful death, which were caused by the untimely death of Mr. Schlosser as a result of the Roof-Crush Defect.

## II.     PARTIES

**A.     Plaintiff**

14.     Wendy Widhalm-Schlosser is domiciled in Ennis, Montana. She is the personal representative of the Estate of Dennis Schlosser, which is being

administered in Montana. Before his death, Mr. Schlosser was domiciled in Ennis, Montana.

**B.    Defendant**

15.    Defendant Ford Motor Company ("Defendant" or "Ford") is a Delaware corporation, organized and existing under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan. At all relevant times, Ford was authorized and/or qualified to do business, and was doing business, in the State of Montana.

16.    Ford designed, manufactured, marketed, and distributed the 2003 Super Duty F-250 and its component parts and systems as alleged herein.

### III.    JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the amount in controversy is greater than $75,000 and the adverse parties are citizens of different states.

18.    This court has personal jurisdiction over Ford because Ford is authorized to do business in the State of Montana and has intentionally availed itself of the markets available in the State of Montana. Ford advertises its cars and trucks, including Super Duty trucks, in Montana via billboards, print, radio, and television ads, and social media. Ford sells its trucks, including Super Duty trucks, via seventy-one Ford dealerships in Montana. Ford sells replacement parts for its cars and trucks,

including Super Duty trucks, in Montana. The claims at issue arise out of Ford's conduct in cultivating a market for Ford vehicles in Montana as the Schlossers purchased the Super Duty at issue based upon and in reliance on Ford's marketing in Montana. In short, Ford has extensive contacts with the state of Montana.

19.    Venue is proper in the District of Montana pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the omissions giving rise to Plaintiff's claims occurred in this District. Venue is proper in the Butte Division pursuant to Local Rules 1.2(c)(2), 3.2(b), and Montana Code Annotated § 25-2-122(2)(b) as Ford is incorporated in another state and Plaintiff resides in Madison County, Montana.

## IV.    STATEMENT OF FACTS

### A.    Ford Super Duty Trucks, Including the F-250, Are Immensely Profitable

20.    In 2020, Ford's CEO, Jim Farley, bragged that "If the Super Duty was a separate company, it would have more revenue than some Fortune 500 companies…. It's part of our F-Series, our most profitable vehicles globally."[1]

---

[1] *Ford Super Duty Trucks Generate 'More Revenue Than Some Fortune 500 Companies,' CEO Says*, YAHOO! FINANCE (Sept. 28, 2020), available at: https://finance.yahoo.com/news/ford-ceo-f-series-super-duty-trucks-revenue-151436052.html (last accessed 12/10/2025).

21.     In 2022, Farley said: "I just want to say, on the Super Duty, obviously that's a quarter of our profitability as a company globally."[2] Ford's 2021 gross profit was $21.7 billion. So, if Mr. Farley was referring to the prior year, that means Ford raked in about $5.3 billion in profit from Super Duty sales in 2021.[3] Historically, Ford has captured 50% of the entire heavy duty truck market with its Super Duty offerings.[4]

## B.    Ford Marketed the Super Duty Trucks, Including the F-250, As Safe and Reliable

22.     Ford marketed the Super Duty trucks as safe, reliable vehicles because Ford knows those qualities matter to consumers.

23.     From the first release of the Super Duty trucks using the 1999 platform, Ford touted their strength and robust design. For example, in the 1999 brochure for

---

[2] *Ford Super Duty Lineup Is an Extremely Valuable Profit Generator*, FORD AUTHORITY (May 6, 2022), available at: https://fordauthority.com/2022/05/ford-super-duty-lineup-is-an-extremely-valuable-profit-generator/ (last accessed 12/10/2025).

[3] *See* "Ford Motor Gross Profit 2010-2023," https://www.macrotrends.net/stocks/charts/F/ford-motor/gross-profit (stating Ford gross profit for 2021 was $21.69 billion) (last accessed 12/10/2025).

[4] *See, e.g.*, *Ford Unveils New F-Series Super Duty Trucks Designed to Boost Its Commercial, Software Services Businesses*, CNBC (Sept. 27, 2022), available at: https://www.cnbc.com/2022/09/27/ford-unveils-new-f-series-super-duty-trucks.html (last accessed 12/10/2025).

the Super Duty trucks, Ford claimed: "Robust design. Body mounts and cab brackets are welded instead of riveted for increased strength":[5]



24.    A promotional brochure for the first generation Super Duty, which includes the 2003 model owned by the Schlossers, was emblazoned with the phrase "Built Ford Tough" on every page.[6] It described the Super Duty as "America's most capable pickup" and boasted that it had been put through a "battery of computer simulations, lab and real-world tests" in "extreme conditions."[7] It specifically highlighted the 2003 Super Duty's "best-in-class towing capabilities," asserting that "systems like trailer sway control" could give drivers "ultimate towing confidence."[8] And it told consumers they could "[t]ake comfort in serious safety standards."[9]

---

[5]    1999 Ford Super Duty Brochure at 12, https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_1999.pdf (last accessed 12/10/2025).

[6]    2003 Ford Super Duty Brochure, https://cdn.dealereprocess.org/cdn/brochures/ford/2003-f250superduty.pdf.

[7] *Id.*

[8] *Id.*

[9] *Id.*

25.    The Schlossers purchased the Super Duty at issue in part because they believed it was a safe truck that would protect themselves and their passengers—including their children—in the event of a crash.

## C.    Weak Roofs Are an Extraordinary Safety Hazard, but Ford Lobbied Against Robust Federal Regulation of Roof Strength

26.    Rollovers are known to be one of the most dangerous types of car accidents.

27.    According to the National Highway Traffic Safety Administration ("NHTSA"), "rollover crashes pose a serious threat to vehicle occupants" and are one of the leading causes of auto-related fatalities.[10] A study by NHTSA published in 2020 concluded that "Stronger vehicle roofs save lives and prevent incapacitating injuries in rollover crashes."[11]

28.    The NHTSA study found that wearing seat belts was critically important to avoiding injury in a rollover, but seat belts alone were not enough. It observed that "a seat belt's effectiveness could be diminished if an occupant's survival space is not adequately maintained during a rollover." In fact, "even if all passengers properly fasten seat belts, their chances of surviving or sustaining less

---

[10] *Evaluation of FMVSS No. 216a, Roof Crush Resistance, Upgraded Standard*, NHTSA (November 2020), available at: https://crashstats.nhtsa.dot.gov/Api/Public/Publication/813027#:~:text=216a-,FMVSS%20No.,threshold%20specified%20in%20FMVSS%20No (last accessed 11/14/23).

[11] *Id.* at i.

severe injury in rollover crashes would be improved if their vehicles properly maintain occupant compartment integrity."[12]

29.     This is not new information. Ford has known for decades that rollovers are extremely dangerous to vehicle occupants and strong roofs can prevent deaths and disabling injuries during rollovers.

30.     On June 25, 1968, Ford published an intra-company safety evaluation titled "Rollover Accidents; A Basis for Establishing Future Roof Strength Performance Requirements." The evaluation indicated that rollovers were far more likely to result in fatalities than front, side, or rear collisions. The report also noted, "[m]any vehicles come to rest on the roof after rollover over [sic]. The roof therefore must support the weight of the vehicle." And the report made a critical recommendation: "It is recommended that roof structure, when subjected to the static roof crush test, support twice the weight of the vehicle while restricting deformation to a value to be determined by a proposed test fixture."

31.     Three years after Ford reached this conclusion, federal regulators at the National Highway Safety Bureau (the predecessor of NHTSA) proposed a safety

---

[12] *Id.* at 2.

standard to "reduce deaths and injuries due to the intrusion of the roof into the passenger compartment in rollover crashes."[13]

32.    Regulators initially proposed testing both front corners of a passenger vehicle roof. To pass the test, a car's roof could not have more than five inches of intrusion into the passenger compartment.[14]

33.    General Motors ("GM") and Ford started testing their vehicles and realized they would not pass NHTSA's proposed roof-strength test.[15]

34.    Ford's Safety and Emissions Programs Group observed that modifying Ford vehicles to comply with the proposed standard would cost the company money. "All car lines, as currently programmed, would require new A-pillars at a cost of $9 to $15 per car," it wrote in a March 1971 memo.[16]

---

[13] "Industry Concealment of Tests Undermined Development of Meaningful Rollover Crash Roof Crush Resistance Standard in 1971," PUBLIC CITIZEN, at 1, available at:
https://www.citizen.org/sites/default/files/industry_undermines_roof_strength_standard_of_1971.pdf (last visited 11/14/2023) (hereafter "Industry Concealment of Tests Undermined Development of Meaningful Rollover Crash Roof Crush Resistance Standard").

[14] *Id.*

[15] *Danger Overhead: Crushed Roofs, Thousands Killed, Hurt as Auto Roofs Collapse*, DETROIT NEWS & FREE PRESS (Apr. 11, 2004), available at: http://www.anderson.ucla.edu/documents/areas/adm/loeb/05b16-1.pdf (last visited 11/14/2023) (hereafter "Danger Overhead: Crushed Roofs, Thousands Killed, Hurt as Auto Roofs Collapse").

[16] *Id.*

35.    GM and Ford "wanted 'something that will allow [their] vehicles to pass.'"[17] So GM and the Automobile Manufacturers Association ("AMA") submitted comments to the National Highway Safety Bureau arguing for changes that weakened the proposed test procedures.[18]

36.    Ford, as a member of the AMA,[19] supported changes to weaken the test procedures.

37.    Just as Big Tobacco contradicted its own studies showing smoking was deadly, "Ford questioned whether crushed roofs even posed a danger—a direct contradiction of its own 1968 study. 'The data do not implicate top intrusion as an automotive safety problem,' Ford said in its April 5, 1971, comments to the agency."[20]

38.    When NHTSA ultimately published its final standard for roof crush resistance for cars in December 1971, it "reflect[ed], almost without change, the modifications to the rule that had been suggested by GM and the AMA."[21]

---

[17] *Id.*

[18] "Industry Concealment of Tests Undermined Development of Meaningful Rollover Crash Roof Crush Resistance Standard," *supra* n.13.

[19] Alliance of Automobile Manufacturers, available at: https://www.automotive-fleet.com/encyclopedia/alliance-of-automobile-manufacturers (last visited 12/10/2025).

[20] "Danger Overhead: Crushed Roofs, Thousands Killed, Hurt as Auto Roofs Collapse," *supra* n.15.

[21] "Industry Concealment of Tests Undermined Development of Meaningful Rollover Crash Roof Crush Resistance Standard," *supra* n.13.

39.     NHTSA's final roof crush requirement, which was applicable to cars but not heavy trucks, was known as Motor Vehicle Safety Standard 216 (FMVSS 216).

40.     Although NHTSA adopted a watered-down version of FMVSS 216, it still recognized the importance of roof strength in its rulemaking notices. The agency wrote that "serious injuries are more frequent when the roof collapses."

41.     In 1999, Ford acquired Volvo. Ford therefore had access to the safety features and technologies used in Ford's Volvo division.[22]

42.     Volvo has a history of making roof strength a priority.[23]

43.     When Volvo introduced its first sport utility vehicle in 2002, the XC90, it released a promotional video claiming the strength of the roof "exceeds the legal requirements in the U.S.A. by more than 100 percent." The Volvo XC90 was sold as "a different S.U.V." with innovations to prevent and mitigate rollovers. A major feature of the car was a roof reinforced with high-strength boron steel.[24]

---

[22] Plaintiffs' Response to Ford Motor Company's Three Motions for "Partial" Summary Judgment at 27, *Hill v. Ford Motor Company*, No. 16 C 04179-2 (State Ct. of Gwinnett Cty., Ga., Sept. 22, 2017).

[23] *Not the Top of the Safety Priorities*, N.Y. TIMES (May 14, 2005), available at: https://www.nytimes.com/2005/05/14/automobiles/not-the-top-of-the-safety-priorities.html (last visited 12/10/2025).

[24] *Id.*

44.    Ford's engineers in the Volvo division emphasized the importance of a strong roof structure with high integrity that would resist deformation.[25]

45.    The roof on the 2002 XC90 was also built as a "safety cage" to ensure survival space for occupants in rollover crashes. This safety cage was "[a] rigid framework surrounding the occupants which creates a support for the interior safety equipment and provides a survival space for the vehicle occupants in case of a crash."[26]

46.    Rather than implement these safety features in Ford-branded vehicles, Ford engineers "told Volvo engineers in 2002 that they needed to de-emphasize vehicle rooftop safety" to "get in line" with the position of Volvo's corporate parent—Ford.[27]

**D.    Ford Knew Super Duty Roofs Were Dangerously Weak, but Sold Them Anyway**

47.    In the 1990s, Ford divided its pickup truck business into two categories using two different platforms: the PN96 and PHN131 platforms. The PN96 trucks, including the F-150 and the Ranger, were lighter trucks with a Gross Vehicle Weight

---

[25] *Hill*, No. 16 C 04179-2 (State Ct. of Gwinnett Cty., Ga., Sept. 22, 2017).
[26] *Id.* at 30.
[27] *Memos Tell of Ford-Volvo Safety Dispute*, CNN (May 16, 2005), available at: http://www.cnn.com/2005/AUTOS/05/14/ford_volvo/ (last visited 12/10/2025).

Rating (GVWR) of 8,500 lbs. or less. The PHN131 trucks were heavier trucks with a GVWR over 8,500 lbs.[28]

48.     PHN131 trucks were intended for commercial use and towing, and they were branded as "Super Duties."

49.     Ford's PHN131 platform included the Super Duty F-250, F-250, F-450, and F-550 trucks.[29] Ford updated the Super Duty platform twice between 1999 and 2016 but never improved the trucks' dangerously weak roof structure.

50.     When Ford was designing the PHN131 platform in the 1990s, there was no federal roof crush resistance standard applicable to trucks of their size.

51.     That was in part thanks to Ford's own lobbying efforts. In 1989, NHTSA proposed extending the federal roof crush resistance standard, FMVSS 216, to vehicles weighing up to 10,000 pounds. But the "Big Three" automakers—including Ford—lobbied against applying FMVSS 216 to heavy trucks.[30]

52.     NHTSA acquiesced, and in 1991 it issued a rule extending the FMVSS 216 to light trucks, vans, and buses with a GVWR of 6,000 lbs. or less.[31] NHTSA

---

[28] Plaintiff's Statement of Additional Material Facts, *Taylor v. Ford Motor Co.*, No. 1:06-cv-00069 (D. Me. Jan. 11, 2008), Dkt. No. 86 at 8.

[29] Plaintiff's Trial Brief, *Ott v. Ford Motor Co.*, No. 4:03-cv-00101 (W.D. Ky. Oct. 19, 2005), Dkt. No. 76-2, at 6.

[30] "Danger Overhead: Crushed Roofs, Thousands Killed, Hurt as Auto Roofs Collapse," *supra* n.15.

[31] *1971 Roof Strength Standard: 33-Year Old Standard Does Not Provide Basic Rollover Crashworthiness Protections*, PUBLIC CITIZEN, available at:

later extended FMVSS 216 to heavier trucks, but FMVSS 216 did not apply to Ford Super Duties until 2017, so there was no federal roof-crush standard applicable to the 2003 Super Duty F-250 when it was manufactured.

53.    In 1991, Ford's internal safety guidelines extended the requirement for FMVSS 216 testing to trucks with a GVWR of less than 8,500 lbs.[32] In other words, Ford decided that the FMVSS 216 standard would apply to light trucks like the F-150, but not heavier trucks like the F-250.

54.    Bruno Barthelemy was the engineering supervisor responsible for the design and development of the PHN131 platform body shell from January 1993 to June 1995.[33]

55.    A vehicle's body shell is the structure that surrounds the occupants of a vehicle, including the doors, roof, pillars, roof rails, windshield header, rear header, windshield, and rear window.[34]

56.    Barthelemy led the engineering team responsible for setting a roof strength target for the PHN131 vehicles.[35]

---

https://www.citizen.org/sites/default/files/chron_roof_crush.pdf    (last    visited 12/10/2025).

[32] *Taylor*, 1:06-cv-00069 (D. Me. Jan. 1, 2008), Dkt. No. 86 at 20.

[33] *Id.*

[34] *Id.*

[35] *Id.*

57.     Because of Ford's successful lobbying efforts, there was no federal regulation setting a roof strength target for the PHN131 vehicles. Nor was there an internal Ford standard establishing a target. So Barthelemy and his team decided the PHN131's roof strength needed to be as good as the PN96 (Ford's lighter, smaller truck platform).[36]

58.     They chose a target roof strength for PHN131 vehicles of 1.5 times the vehicle's maximum unloaded weight.[37]

59.     Barthelemy's design focus was not safety. The target roof strength was required because "[t]he engineers needed some kind of target from a structural engineering point of view. They need a target so they could say this is enough or they need to continue, so that is how they set the target up."[38]

60.     When designing the PHN131 body shell, Ford engineers knew rollovers were inevitable.[39]

61.     Despite this knowledge, they never performed *any* physical roof crush testing on PHN131 vehicles before they were sold to the public.[40]

62.     In 1995, a Ford Automotive Safety and Engineering Standards employee asserted that physical roof crush testing was unnecessary for PHN131

_____

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.* at 21.

[40] *Id.*

vehicles because "The LAW applies only to vehicles of 6,000 lbs. GVW and under."[41]

63.     In the same message, he noted that because "there is no REGULATORY REQUIREMENT for roof crush resistance in vehicles of more than 6,000 lbs. GVW, no actual tests are planned."[42]

64.     Thus, after Ford successfully lobbied federal regulators not to impose a roof strength regulation on heavy trucks like the F-250, Ford used this lack of regulation as its own internal excuse to build PHN131 vehicles with weak roof structures *and* not to perform any physical tests that would reveal how weak the roofs were.

65.     In lieu of physical tests, Ford used Computer Aided Engineering (CAE) to model the PHN131's roof strength.[43]

66.     By January 1996, the PHN131 design process was well underway. The PHN131 received "Analytical Sign-Off" just a few months later, in April 1996.[44] But in January 1996, Ford began to plan for "aggressive" cost-cutting "to reduce the

---

[41] Exhibit 1 to Ford Motor Company's Response in Opposition to Plaintiffs' Motion in Limine, *Gibson v. Ford Motor Co.*, No. 1:06-cv-01237 (N.D. Ga. Sept. 24, 2007), Dkt. No. 177-1 at 3.

[42] *Id.*

[43] *Taylor*, No. 1:06-cv-00069 (D. Me. Jan. 1, 2008), Dkt. No. 86 at 21.

[44] *Id.* at 23.

cost of the PHN131 pickup post Job #1," i.e., after the first PHN131 vehicles were sold on January 5, 1998.[45]

67.    By the time a vehicle receives Analytical Sign-Off, "the design of the vehicle is totally done."[46]

68.    According to the Analytical Sign-Off of the PHN131, the roof crush resistance target for a PHN131 vehicle with a regular cab was 9,600 pounds. The target for both Super Cab and Crew Cab vehicles was 10,500 pounds.[47]

69.    The "status" of the Super Cab roof crush resistance was listed as 10,600 pounds, and the "status" of the Crew Cab roof crush resistance was listed as 10,484 pounds.[48]

70.    Assuming that "status" indicates how the vehicles were performing in computerized tests at the time of the Analytical Sign-Off, Ford was barely meeting its self-imposed roof strength target for Super Cabs, and it was not meeting the target for Crew Cabs.[49]

---

[45] *Id.* at 26.

[46] *Id.* at 23.

[47] Exhibit C to Motion for Partial Summary Judgment—Exemplary Damages, *Powell v. Ford Motor Co.*, No. 7:12-cv-00114 (W.D. Tex. March 10, 2014), Dkt. No. 48-3 at 52.

[48] *Id.*

[49] *Id.*

71.     Yet *after* Analytical Sign-Off of the PHN131, Ford approved a series of changes to the PHN131 roof—all of which weakened the roof and saved Ford money.[50]

72.     When you downgauge steel you reduce its thickness. When you reduce the thickness of steel, you lessen its structural capacity.[51]

73.     On July 12, 1996, Ford approved the deletion of the front header outer from the PHN131 vehicle's design.[52] The deletion of the windshield outer saved Ford $3.50 per vehicle and $500,000 in tooling costs.[53] Deletion of the front header outer weakened the windshield header.[54]

74.     On December 4, 1996, Ford authorized the replacement of the Boron steel rear door front vertical beam with a vertical beam made of mild steel. The vertical beam is what Ford generically called the "floating B-pillar."[55] Boron steel is 4 or 5 times stronger than normal steel.[56] Replacing the Boron steel part with a mild steel part saved $20.86 per vehicle and tooling costs of $1,033,800.[57]

---

[50] *Taylor*, No. 1:06-cv-00069 (D. Me. Jan. 1, 2008), Dkt. No. 86 at 26–30.
[51] *Id.* at 29.
[52] *Id.* at 27.
[53] *Id.*
[54] *Id.*
[55] *Id.* at 29.
[56] *Id.* at 30.
[57] *Id.* at 29.

75.    The A-pillar is the part of the vehicle to which the windshield and front door hinges are attached.[58] As of May 1997, the PHN131 A-Pillar was designed to be 2.5mm thick.[59] On September 18, 1998, Ford downgauged the A-Pillar from 2.4mm to 2.35mm. This was a downgauge of 2%, for a cost savings of $0.70 per vehicle and no tooling cost.[60]

76.    On March 30, 1999, Ford approved a downgauge of the A-pillar from 2.35 mm to 2.2 mm. This was a downgauge of 6.4% with a cost savings of $0.86 per A-Pillar or $1.72 per vehicle.[61]

77.    On June 15, 1999, Ford authorized the downgauge of the rear door front vertical beam from 1.5 mm to 1.2 mm. The 20% downgauge resulted in a savings of $0.48 per door or $0.96 per vehicle.[62]

78.    On August 8, 1999, Ford authorized a downgauge from 1.2 mm to 1.07 mm for the windshield header inner. This was an 11% decrease in thickness for a cost savings of $0.17 per vehicle.[63]

---

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.* at 30.

[63] *Id.* at 28.

79.    On August 10, 1999, a design change was approved that downgauged the roof bows from 0.8mm to 0.74mm. This was a 7.5% reduction in thickness and resulted in a cost savings of 5 cents per bow or 10 cents per vehicle.[64]

80.    In short, Ford significantly weakened the PHN131 roof structure when it deleted the front header outer; replaced the Boron steel B-pillar with mild steel; and downgauged the windshield header inner, roof bows, A-pillar, and rear front door vertical beam—all in an effort to save money on the manufacture of PHN131 trucks.

81.    Even after years of chipping away at the safety of the roof design, Ford did *no* testing to determine what impact any of the downgauges and changes in roof structure had on roof crush strength—not CAE testing and not real-world physical testing.

82.    Moreover, when asked to produce the CAE tests that supported the original April 1996 Analytical Sign-Off, *Ford couldn't find the tests*.

83.    In previous litigation regarding a 2001 Ford F-250 that rolled over and paralyzed its driver, Ford failed to produce the CAE tests that supposedly supported the PH131 Analytical Sign-Off, asserting that it couldn't find documentation of those tests. The court ordered Ford's counsel to provide an affidavit concerning its efforts to locate the tests. A Ford employee submitted an affidavit asserting that he

---

[64] *Id.*

had searched for the tests and interviewed people in an effort to find them, but he was unable to locate the CAE tests regarding roof strength of the PH131.[65]

84.     Testing of PHN131 vehicles in other litigation has shown that the trucks Ford put on the market did not meet even its own internal standards. The trial brief in *Ott v. Ford Motor Co.* ("Ott"), filed in the Western District of Kentucky, explained with respect to a model year 2000 F-250 Super Duty:

> Ford admits it did not perform a physical roof strength test prior to the vehicle being sold—not a dolly rollover test, not a roof drop test and not a Federal Motor Vehicle Safety Standard ('FMVSS') 216 roof crush test. Ford claims it performed a computer version of the FMVSS 216 test, but it cannot find the test data or any test report. Litigation testing shows that not only did the F-250 roof fail to meet Ford's 10,500-pound roof strength design target, it also shows that the roof strength of its F-250 Super Duty truck is weaker that its smaller and lighter pickup trucks—the F-150 and Ranger."[66]

85.     In sum, Ford didn't perform any physical tests of the roof strength of the PHN131. It mysteriously cannot find the CAE roof-strength tests that supposedly supported the Analytical Sign-Off on its original PHN131 design. And it admits that it *didn't even try* to test the roof strength of the cheaper, weaker PHN131 vehicles it actually put on the market.

---

[65] *Id.* at 25–26.
[66] *Ott*, No. 4:03-cv-00101 (W.D. Ky. Oct. 19, 2005), Dkt. No. 76-2, at 3.

**E.    Ford Could Have Designed Super Duty Trucks with Stronger, Safer Roofs**

86.    Ford's decision to release the PHN131 vehicles with weak, cheap roofs is particularly deplorable because it could have easily designed and manufactured stronger roofs.

87.    Ford engineers who were involved in designing the PHN131 body shell have testified that they could have designed a body shell to meet a higher roof strength target.[67] Barthelemy testified that "[i]f someone had come to [him] and said he was to design the roof structure of the PHN131 pickup to withstand two times gross vehicle weight with only two inches deflection, he absolutely could have come up with a structure that met the requirement."[68]

88.    That testimony wasn't just post-hoc puffery. In late 1994 and early 1995, the PHN131 engineering team exchanged a series of memos about CAE data on PHN131 roof strength. Those memos show that Ford's engineers were aware of specific design changes that would enhance roof strength.[69]

89.    An October 11, 1994 memo indicated that CAE analysis of an X-shaped roof bow yielded an increase in peak roof crush resistance from 9,600 lbs. to 10,600 lbs.[70]

---

[67] *Taylor*, No. 1:06-cv-00069 (D. Me. Jan. 1, 2008), Dkt. No. 86 at 34–35.
[68] *Id.*
[69] *Id.* at 21.
[70] *Id.* at 22.

90.    An October 26, 1994 memo indicated that placing a proposed X-shaped roof bow in the rear increased front roof crush peak resistance by 1,100 lbs. and rear roof crush resistance by 1,700 lbs. The resultant roof crush resistances were 10,700 lbs. in the front and 10,400 lbs. in the rear.[71]

91.    A memo dated January 19, 1995, reported that placing an X-shaped roof bow in the rear and a second bow in the front resulted in roof crush resistance of 10,980 lbs.[72]

92.    Despite this evidence that X-shaped roof bows could strengthen the roof, Ford engineers didn't incorporate X-shaped bows into the PHN131 roof because they were meeting their self-imposed roof crush targets.[73]

93.    Evidence from after the release of the PHN131 vehicles also shows that Ford had the ability to design a stronger roof.

94.    Beginning in 2004—three years before Mr. Schlosser purchased the F-250—Ford organized a Roof Strength Task Force and assigned engineers to a project called the Enhanced Roof Strength Project (ERSP).[74]

---

[71] *Id.*
[72] *Id.*
[73] *Id.* at 23.
[74] *Hill*, No. 16 C 04179-2 (State Ct. of Gwinnett Cty., Ga., Sept. 22, 2017), at 2–5, 31.

95.     An ERSP engineer testified that the goal of the project was to design a stronger and safer roof for Super Duty trucks to "solve" the "problem" of people being killed or severely injured in rollovers.[75]

96.     The ERSP developed a roof that could withstand 55,000 lbs. of force.[76]

97.     Beginning in model year 2009, Ford put the stronger and safer roof developed by the ERSP in F-150 trucks.[77] The model year 2009 F-150 brochure boasted that the truck had a new "high-strength safety cage structure" and that this was the "safest F-150 yet."[78]

98.     With the ERSP roof, the F-150 had a strength-to-weight ratio (SWR) of 4.72.[79] But the supposedly durable and robust Super Duty had a SWR of just 1.1.[80]

99.     Rather than implementing the stronger and safer ERSP roofs in Super Duty trucks, Ford continued selling heavyweight Super Duty trucks with weak roofs for years.

100.    All of the flaws of the PHN131's roof system were carried over into the subsequent Super Duty platforms known as P356 (model years 2008–2010) and P473 (model years 2011–2016).

---

[75] *Id.* at 32–33.
[76] *Id.* at 2, 31.
[77] *Id.* at 3, 34.
[78] *Id.* at 34.
[79] *Id.*
[80] *Id.*

101.   Ford did not strengthen the roof of the Super Duty line until 2017—when new government regulations finally forced it to do so.[81]

## F.   Super Duty Roofs Were Routinely Crushed in Rollovers, but Ford Chose Not to Warn Consumers

102.   Ford should never have released Super Duty trucks with the PHN131 platform, which was too weak to protect drivers or passengers in the event of a rollover. But since it did, those vehicles should have been accompanied by a warning that their roofs were prone to collapse in rollovers.

103.   At the very least, Ford should have issued a warning to consumers about the possibility of roof crush when it became aware that Super Duty roofs were collapsing and killing or disabling drivers.

104.   As early as 1999, Ford began receiving word that Super Duty roofs were crumpling like paper in rollovers.[82]

105.   Through lawsuits and other claims, Ford learned that when Super Duty roofs were crushed in rollovers, the roofs intruded dramatically into the passenger compartment, killing and paralyzing drivers.[83]

---

[81] *Id.* at 33.

[82] *Id.*

[83] *Id.*

106.   As of February 2025, Ford was aware of at least 285 lawsuits alleging that someone had been killed or seriously injured when the roof of a 1999–2016 Super Duty truck collapsed during a rollover.

107.   Ford settled the vast majority of these lawsuits with settlements that included confidentiality provisions, ensuring that the public would not learn about the nature of the defect or the victims' injuries.

108.   At some point between 1999 and 2025, Ford should have issued warnings about the likelihood of roof crush through a variety of channels, including its authorized dealerships and vehicle-related publications such as brochures and owners' manuals. Such warnings would have allowed Super Duty owners like the Schlossers to decide to stop driving their dangerous trucks.

109.   If the Schlossers had known that the Super Duty F-250 roof was likely to collapse during a rollover, they would not have purchased the vehicle.

110.   If the Schlossers had learned *after* purchasing their Super Duty F-250 that the roof was likely to collapse during a rollover, they would have stopped driving the vehicle.

111.   But Ford chose not to issue a warning about the likelihood of roof collapse. Instead, it kept raking in the profits from its Super Duty line and left consumers in the dark about the dangers they faced every time they got in their Super Duty trucks.

**G.    The Schlossers' Super Duty Rolled Over and Killed Mr. Schlosser**

112.    On May 22, 2007, Mr. Schlosser purchased the 2003 Ford F-250.

113.    The Schlossers purchased the Super Duty F-250 because they needed a large, durable truck they could use to pull a trailer, camper, and boats in Montana. They also purchased the Super Duty F-250 because they believed, based upon Ford's marketing and representations, that it was a safe, tough truck that would protect them and their passengers in the event of an accident.

114.    Ford did not warn the Schlossers that the Super Duty roof had been weakened so that it was prone to collapse during a rollover.

115.    When he purchased their Super Duty, Mr. Schlosser received printed materials from Ford, including an owner's manual. Mr. Schlosser reviewed those materials. None of the materials disclosed that the Super Duty roof had been weakened so that it was prone to collapse during a rollover.

116.    On July 3, 2025, Mr. Schlosser was traveling from California to his home in Ennis, Montana, to begin his retirement after 28 years as a corrections officer.

117.    He was traveling eastbound on IR80 near Eureka, Nevada, hauling a trailer with furniture and personal belongings. As he approached mile-marker 22, he lost control of the vehicle, the Ford's wheels furrowed in the pavement, and it rolled

several times, coming to rest on its wheels. The Ford's airbags did not deploy during the roll.

118.   Mr. Schlosser was conscious when extracted from the vehicle and taken by Reach Air ambulance to Utah University Medical Center for treatment of his catastrophic injuries.

119.   The University of Utah medical center physicians diagnosed Mr. Schlosser with a spine injury. Specifically, a displaced fracture of his seventh cervical vertebrae (C7-T1), the crucial transition point where the cervical spine meets the thoracic spine. He was also diagnosed with anterior subluxation and bilateral superior articular facet fractures, ventral epidural hematoma T2, T3, T5, and T6 vertebral body compression fractures, and displaced fractures of left 7th and 8th ribs. The injuries resulted in paraplegia.

120.   Mr. Schlosser further struggled with respiratory stability and secretion management.

121.   On July 11, 2025, Mr. Schlosser passed away due to his injuries at the University of Utah medical center. Mr. Schlosser suffered severe and unrelenting pain prior to his death.

## V.    CAUSES OF ACTION

### COUNT I
### STRICT PRODUCT LIABILITY
### (DEFECTIVE DESIGN & FAILURE TO WARN)

122.    Plaintiff refers to all preceding paragraphs and incorporates them as though set forth in full in this cause of action.

123.    At all relevant times, Ford has been in the business of, controlled, and engaged in the designing, manufacturing, marketing, distributing, and selling of vehicles, including the Schlossers' Super Duty.

124.    As a manufacturer and distributor of vehicles, Ford had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous and Ford owed that duty to the Schlossers.

125.    As a manufacturer and distributor of vehicles, Ford had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of the Super Duty and Ford owed that duty to the Schlossers.

126.    Ford marketed, distributed, and sold its vehicles, including the Super Duty at issue, in Montana with the intent of inducing Montanans such as the Schlossers to purchase and use Super Duty trucks in Montana, where Ford has cultivated a market for the easy purchase, use, and service of its vehicles.

127.    The Schlossers' Super Duty was expected to and did reach the Schlossers without substantial change in the condition in which it was sold.

- 31 -

128.     The Roof-Crush Defect described above rendered the Schlossers' Super Duty unreasonably dangerous and unfit for its intended use as it presented a foreseeable, significant, and unnecessary risk of catastrophic and/or fatal injury to vehicle occupants in the case of foreseeable accidents resulting from foreseeable uses and misuses of the Super Duty.

129.     The Roof-Crush Defect described above posed an unreasonable risk to the Schlossers beyond that which would be expected or contemplated by an ordinary consumer when used in ordinary and reasonably foreseeable manners.

130.     The Roof-Crush Defect described above was the direct and proximate cause of Mr. Schlossers' death and Plaintiff's injuries.

131.     Mr. Schlosser was using the Schlossers' Super Duty as intended.

132.     As described above, Ford knew of the risks posed by the Roof-Crush Defect and nonetheless failed to use reasonable care in the design of the Super Duty trucks.

133.     As described above, Ford knew about the risks posed by the Roof-Crush Defect and failed to warn the public, or even registered owners of effected vehicles, such as the Schlossers, of the dangers.

134.     As described above, Ford could have remedied or otherwise materially mitigated the risks posed by the Roof-Crush Defect prior to manufacture of the Schlossers' Super Duty had Ford prioritized customer safety over its own profits.

135. Ford's failure to implement reasonable, feasible, safer alternative designs for the Super Duty roofs rendered their product unreasonably dangerous to persons and property.

136. Ford's failure to adequately warn of known dangers posed by the Roof-Crush Defect rendered the Schlossers' Super Duty defective and unreasonably dangerous.

137. At all relevant times, the foreseeable risks of harm to Ford's customers and their property posed by the Roof-Crush Defect outweighed the utility and cost to Ford of reducing or eliminating the risks.

138. Ford's defective design and failure to warn caused the non-instantaneous death of Mr. Schlosser, causing him significant pain and suffering and emotional distress and anguish before he died and depriving his wife and children of the consortium and support of their husband and father.

## COUNT II
## NEGLIGENCE

139. Plaintiff refers to all preceding paragraphs and incorporates them as though set forth in full in this cause of action.

140. Ford owed Plaintiff a duty of reasonable care in the design of the Schlossers' Super Duty.

141. Ford owed Plaintiff a duty of reasonable care to warn her of known dangers posed by the Roof-Crush Defect.

142.   As more fully described above, Ford breached these duties to Plaintiff by failing to adequately test the Super Duty roofs, failing to implement a safer design, and working to materially reduce the structural integrity of the Super Duty roofs.

143.   As more fully described above, Ford breached its duty to warn by failing to inform owners and would-be purchasers of known risks posed by the Roof-Crush Defect.

144.   Had Ford adequately designed the roof of the Schlossers' Super Duty, or informed them prior to or after their purchase of the vehicle, Mr. Schlosser would not have died as a result of the rollover accident on July 3, 2025.

145.   Ford's breaches of its duties are the direct and proximate cause of the non-instantaneous death of Mr. Schlosser, the significant pain and suffering and emotional distress and anguish he experienced before he died, and the damages suffered by the wife and children he left behind.

## COUNT III
## LOSS OF CONSORTIUM

146.   Plaintiff refers to all preceding paragraphs and incorporates them as though set forth in full in this cause of action.

147.   Mrs. Schlosser brings this claim in her individual capacity.

148.   Mr. and Mrs. Schlosser enjoyed a close and fulfilling marriage that existed until the moment of his death on July 11, 2025.

- 34 -

149.   As a result of Ford's unlawful conduct described above, Mrs. Schlosser has been deprived of the support, aid, protection, affection, and society of Mr. Schlosser.

## COUNT IV
## PUNITIVE DAMAGES

150.   Plaintiff refers to all preceding paragraphs and incorporates them as though set forth in full in this cause of action.

151.   As more fully described above, Ford was aware of the significant threat to passengers of the Super Duty truck at issue posed by the Roof-Crush Defect and, despite this knowledge, continued to manufacture, market, distribute, and sell the Super Duty trucks without warning of the dangers or attempting to remedy or mitigate the dangers.

152.   Ford's conduct constitutes actual malice as defined by Montana Code Annotated § 27-1-221(2) as Ford deliberately acted in conscious or intentional disregard of the high probability of injury to Plaintiff or otherwise proceeded to act with indifference to the high probability of injury to Plaintiff.

153.   Plaintiff has been injured as a direct result of Ford's disregard or indifference to the known dangers posed by the Roof-Crush Defect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court will enter judgment in her favor and against Defendant as follows:

a.  Finding Defendant liable for product defect and negligence;

b.  For all special and general damages suffered by Mr. Schlosser during the period between the accident and his death, in an amount to be proven at trial;

c.  For all special and general damages suffered by the Estate of Dennis Schlosser, in an amount to be proven at trial;

d.  For loss of consortium damages suffered by Mrs. Schlosser, in an amount to be proven at trial;

e.  For punitive damages, in an amount to be proven at trial;

f.  For costs and pre- and post-judgment interest, as determined by the Court; and

g.  For any and all further legal or equitable relief as the Court deems proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: December 16, 2025        Respectfully submitted,

*/s/ John Heenan*
John Heenan
Joseph F. Cook
**HEENAN & COOK, PLLC**
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9091
john@lawmontana.com
joe@lawmontana.com

Steve W. Berman*
Jacob P. Berman*
Meredith S. Simons*
**HAGENS BERMAN SOBOL
SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Email: steve@hbsslaw.com
Email: jakeb@hbsslaw.com
Email: merediths@hbsslaw.com

***Attorneys for Plaintiff***

*Pro hac vice application to be filed